

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-25-00043-CV

**IN THE INTEREST OF A.D.M. JR.**, a Child

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA01182
Honorable Raul Perales, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Lori I. Valenzuela, Justice
    Adrian A. Spears II, Justice
    H. Todd McCray, Justice

Delivered and Filed: June 18, 2025

AFFIRMED

Appellant R.M. ("Mother") appeals the trial court's order terminating her parental rights to her child, A.D.M. Jr. (born 2023).[1] In four issues, Mother argues the evidence is legally and factually insufficient to support the trial court's termination findings under Texas Family Code section 161.001(b)(1)(D), (E), and (O) and the trial court's finding that termination was in A.D.M.'s best interest. We affirm the termination order.

---

[1] To protect the privacy of the minor child, we use initials or pseudonyms to refer to the child, his biological parents, and his current caregiver. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

On the day of A.D.M.'s birth in July of 2023, the Texas Department of Family and Protective Services (the "Department") received a report of "mom and dad being incarcerated, and mom being positive for illegal substances with a newborn." At that time, both Mother and A.D.M.'s father, A.D.M. Sr. ("Father"), had been charged but not yet tried in connection with an April 2023 incident that resulted in the death of A.D.M.'s older sibling, R.M. The Department removed A.D.M., obtained temporary managing conservatorship over him, placed him with his paternal grandmother, C.T. ("Grandmother"), and filed a petition to terminate Mother's and Father's parental rights. The Department also created a family service plan requiring Mother to, *inter alia*, maintain and provide proof of "a safe and stable home"; complete a Department-approved domestic violence course and "demonstrate an understanding of the newly acquired skills in her current relationship and/or future romantic relationships"; comply with random drug testing; and complete a substance abuse assessment "and follow any recommendations by the service provider." The Department ultimately pursued termination of Mother's parental rights.[2]

Seventeen months after removal, the trial court held a one-day bench trial at which Mother appeared. The trial court heard substantive testimony from eleven witnesses: (1) Jessica Barrera, the Department investigator who removed A.D.M.; (2) Anita Seamans, a Department special investigator who interviewed Mother and Father after the April 2023 incident; (3) Tracy Vigil, the Department caseworker assigned to this case; (4) Wendy Legler, a mental health counselor with Crosspoint, the facility Mother moved into after her release from jail; (5) Frederick Washington, Mother's former substance abuse counselor at Crosspoint; (6) David Rodriguez, a Bexar County pretrial services employee; (7) Britney Durham, Mother's defense attorney in the criminal case

---

[2] The trial court terminated Father's parental rights pursuant to a voluntary affidavit of relinquishment. Father is not a party to this appeal.

arising from the April 2023 incident; (8) Marisol Morales, a social worker with the Bexar County Public Defender's Office who was providing counseling to Mother at the time of trial; (9) Mother; (10) a CASA volunteer; and (11) Grandmother.[3] After hearing the evidence, the trial court signed an order terminating Mother's parental rights pursuant to Texas Family Code section 161.001(b)(1)(D), (E), and (O) and entered a finding that termination of Mother's parental rights was in the best interest of A.D.M. Mother appealed.

## ANALYSIS

### Applicable Law and Standard of Review

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and convincing evidence, both that a statutory ground existed to terminate Mother's parental rights and that termination was in A.D.M.'s best interest. *Id.*; TEX. FAM. CODE § 161.206. "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's

---

[3] The Department also called a twelfth witness, a San Antonio police officer who testified that he did not remember responding to any incidents involving Mother or Father. The officer did not offer any substantive testimony.

findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (citation omitted). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

### *Statutory Termination Grounds*

#### *Applicable Law*

In her first three arguments on appeal, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's predicate findings under subsections (D), (E), and (O). In general, assuming a best interest finding, only one predicate ground under section 161.001(b)(1) is necessary to support a judgment of termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, because termination under subsections (D) or (E) may have implications for a parent's parental rights to other children, appellate courts must address a parent's challenges to a trial court's findings under those subsections. *In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam).

"Endangerment means to expose to loss or injury, to jeopardize." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Subsection (D) allows a trial court to terminate parental rights if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Under

subsection (D), the trial court examines "evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d at 125. "'Environment' refers to the acceptability of living conditions and a parent's conduct in the home." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *Id*. A parent does not need to know for certain that the child is in an endangering environment. *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.). Awareness of a potential for danger is sufficient. *Id.* In a subsection (D) analysis, the relevant period for review is before the Department removes the child. *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Subsection (E) allows a trial court to terminate a parent's rights if it finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), the trial court determines whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being. *See In re J.T.G.*, 121 S.W.3d at 125. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re R.S.-T.*, 522 S.W.3d at 110 (internal quotation marks omitted). In a subsection (E) analysis, the relevant period for review is wider than that involved in subsection (D) and can encompass parental conduct that did not occur in the child's presence, including conduct before the child's birth or after the child was removed from a parent's

care. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at \*4–5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

### *Application*

Mother argues the evidence is insufficient to support the trial court's findings under subsections (D) and (E) because A.D.M. was removed shortly after his birth and Mother therefore "never had an opportunity to parent the child after his birth and the child was never in any danger." The Texas Supreme Court has held, however, "that endangering conduct is not limited to actions directed towards the child" and "may include the parent's actions before the child's birth, while the parent had custody of older children[.]" *In re J.O.A.*, 283 S.W.3d at 345. We therefore decline to reverse the subsection (D) and (E) findings on this basis.

Under subsection (D), "a single pre-removal act, omission, or incident can support termination." *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at \*9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). Here, the evidence showed that on April 12, 2023, three months before Mother gave birth to A.D.M., she engaged in an altercation with Father that resulted in the shooting and eventual death of A.D.M.'s older sibling, R.M. The Department's special investigator, Seamans, interviewed Mother on the day of the shooting and testified in this trial as follows:

> [Mother] told me that she had been arguing with [Father] and that the argument had started upstairs in the apartment of her sister and that it continued downstairs where [Father] was trying to leave.
>
> And he had gotten into his car, and [Mother] placed herself in the open V of the doorway to prohibit [Father] from being able to leave the location.

While standing there continuing the argument, [Mother's] sister came downstairs holding the baby, [R.M.]; and that while standing and arguing, [Mother] took the baby and put it on her right hip.

So she was holding the child on her right hip standing in the open doorway of the vehicle leaning into the driver's compartment arguing with [Father].

The story diversed [*sic*] a little bit there. [Father] told me that [Mother] brought the gun, and [Mother] said that [Father] brought the gun, but a gun was produced.

And [Father] was seated in the vehicle; [Mother] was bent over into the compartment with the child on her right hip, and a struggle over the weapon ensued.

And during the struggle over control of the weapon, the weapon discharged.

[The bullet] traveled in a vertical line across the abdominal area of [Mother], and then entered the baby [R.M.] and traveled up into the baby's abdominal area and a little higher up into the chest cavity.

The baby was operated on and died on the operating table at about 10:20 that evening.

Seamans further testified that she later interviewed Mother a second time, and Mother "told [her] the same story, and she didn't divert from that." Mother did not cross-examine Seamans or otherwise dispute her testimony on this issue.

There is no evidence that A.D.M. was injured in this incident. However, parental conduct during pregnancy can constitute endangerment of the fetus. *See, e.g.*, *In re M.K.V.*, 648 S.W.3d 478, 486 (Tex. App.—San Antonio 2021, no pet.); *In re K.L.B.*, No. 14-09-00061-CV, 2009 WL 3444833, at *3 (Tex. App.—Houston [14th Dist.] July 16, 2009, no pet.) (mem. op.). Additionally, "when parents injure or harm one of their children, a factfinder may infer that the parents have endangered their other children." *J.B.M.H. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *3 (Tex. App.—Austin Apr. 13, 2023, pet. denied). Even if we assume the evidence was insufficient to establish that Mother herself introduced the gun into the confrontation, Seamans's testimony showed that Mother engaged in a physical struggle with

Father over a gun while she was: (1) holding R.M.; and (2) pregnant with A.D.M. Seamans's testimony also tended to show that Mother could have avoided the altercation if she had not tried to prevent Father from leaving. Based on that evidence, the trial court could have reasonably found that Mother knowingly placed both children in conditions or surroundings that endangered their physical well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D).

Unlike subsection (D), subsection (E) requires evidence of a voluntary and deliberate endangering course of conduct rather than a single act or omission. *See, e.g.*, *In re F.S.F.*, No. 04-24-00125-CV, 2024 WL 3800662, at *2 (Tex. App.—San Antonio Aug. 14, 2024, no pet.) (mem. op.). "Subsection (E) is not limited to actions directed towards the child . . . nor is it limited to the parent's pre-removal actions." *In re A.O.*, 2022 WL 1257384, at *9 (internal quotation marks omitted). A trial court conducting a subsection (E) analysis may consider actions that occurred before the child's birth, while the child was not in the parent's presence, and while the child was in the Department's custody. *See In re J.O.A.*, 283 S.W.3d at 345. "The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *In re E.J.M.*, 673 S.W.3d 310, 331 (Tex. App.—San Antonio 2023, no pet.) (op. on reh'g) (internal quotation marks omitted).

Mother was charged with aggravated assault with a deadly weapon in connection with R.M.'s death. She was jailed on that charge at the time of A.D.M.'s removal, but she was released from jail approximately five months before the trial in this case and presented uncontroverted evidence that the State had agreed to dismiss the charge against her in exchange for her testimony against Father. Accordingly, there was no evidence that Mother faced any threat of incarceration that might be relevant to a subsection (E) analysis. *Cf. In re J.F.-G.*, 627 S.W.3d 304, 314 (Tex. 2021). Furthermore, because the event that led to R.M.'s death was a single incident, it was not

independently sufficient to support a subsection (E) finding. *See, e.g.*, *In re J.C.P.L.*, No. 01-24-00723-CV, 2025 WL 757159, at *5 (Tex. App.—Houston [1st Dist.] Mar. 11, 2025, pet. denied) (mem. op.).

Nevertheless, the trial court could consider that event in conjunction with other acts or omissions to determine whether Mother engaged in an endangering course of conduct. *See In re R.W.*, 129 S.W.3d at 743. For example, we have previously recognized that a parent's failure to complete domestic violence classes is evidence of endangerment. *In re M.K.V.*, 648 S.W.3d at 487. Here, it was undisputed that Mother did not complete a battering intervention course required by her service plan. Mother testified that she only needed to complete one more session to finish the course, but other witnesses testified that she completed 10 hours of a course that usually lasts between 26 and 52 weeks.

The Department did not present any evidence that Mother remained in a relationship with Father. However, the trial court could have reasonably concluded that her failure to complete the battering intervention course was relevant to a subsection (E) analysis for at least two reasons. First, as noted above, Seamans's testimony about the incident that resulted in R.M.'s death tended to show that Mother voluntarily placed both herself and R.M. in danger by refusing to allow Father to leave. *Cf. A.M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-22-00240-CV, 2022 WL 11399256, at *7 (Tex. App.—Austin Oct. 20, 2022, no pet.) (mem. op.) (parent's failure to remove children from instances of domestic violence supported subsection (E) finding). Second, the evidence showed that at the time of trial, Mother was living with a new paramour, Ariana, who had been arrested for aggravated assault with a deadly weapon and was "currently out on bond[.]" Mother testified that she had known Ariana "for a couple of years," had never seen her lose her temper, and had never had to use the skills she learned in her domestic violence classes with

Ariana. Similarly, Mother's counselor, Morales, testified that she was not concerned about Mother's or A.D.M.'s safety with Ariana. Morales conceded, however, that she had never met Ariana and did not know anything specific about the assault charge pending against her. In contrast to Mother's and Morales's testimony, caseworker Vigil testified that Mother's relationship with Ariana was concerning because she believed it showed Mother's "decision making is not in the best interest of [A.D.M.]. The individual that she is in a relationship with is—based on the charges—a violent person, and that's not appropriate for [A.D.M.] to be around. And it seems that the history is continuing." *Cf. In re M.R.D.*, No. 04-19-00524-CV, 2020 WL 806656, at *7 (Tex. App.—Feb. 19, 2020, pet. denied) (mem. op.) (evidence showing parent's "pattern of engaging in domestic violence relationships" was sufficient to support subsection (E) finding). When asked if Mother acknowledged Ariana's criminal charges as a concern, Vigil responded, "She acknowledges that I told her it's a concern, yes." Vigil also testified that Mother understood that continuing the relationship could affect this termination proceeding and that she was nevertheless still involved in the relationship at the time of trial. Based on this testimony, the trial court could have concluded Mother's failure to complete the battering intervention program showed a failure to address her history of domestic violence and thus tended to establish an endangering course of conduct. *See In re M.K.V.*, 648 S.W.3d at 487; *In re N.M.A.*, No. 04-21-00256-CV, 2021 WL 5812291, at *4 (Tex. App.—San Antonio Dec. 8, 2021, no pet.) (mem. op.).

The Department also presented evidence that Mother had a history of drug use. *See, e.g., In re J.C.P.L.*, 2025 WL 757159, at *5 ("Evidence of a parent's illegal drug use may support termination under Subsection (E)."). Mother, who was 22 at the time of trial, testified that she last used methamphetamines "when [she] was about 17 or 18" and last used marijuana "[w]hen [she] was 21. . . . [b]efore the incident" that resulted in R.M.'s death. Barrera, on the other hand, testified

that when she interviewed Mother at the hospital after A.D.M.'s birth, Mother "denied knowing about use of ice [methamphetamines], but admitted to marijuana use." Washington, Mother's substance abuse counselor at Crosspoint, testified that he recalled "there was some use of methamphetamines." Morales similarly testified that her treatment of Mother addressed "[p]revious stimulant use."

Barrera testified that Mother was "positive for illegal substances with a newborn" at the outset of this case. Although Barrera testified that A.D.M. tested negative for drugs at birth, she also testified that the Department received the report of Mother's positive drug test on the day A.D.M. was born. Based on that testimony, the trial court could have inferred that Mother used illegal substances while she was pregnant with A.D.M. *See, e.g.*, *In re A.B.R.*, No. 04-19-00631-CV, 2020 WL 1159043, at \*4 (Tex. App.—San Antonio Mar. 11, 2020, pet. denied) (mem. op.) (mother's illegal drug use during pregnancy is endangering conduct).

The Department did not present any evidence that Mother tested positive for illegal substances after A.D.M.'s removal. Vigil testified that Mother appeared for her drug tests as ordered during this case,[4] and Morales testified that Mother's substance abuse was "in remission at this time." However, Vigil testified that she "had concerns with [Mother's] drug testing" because Mother submitted diluted urinalysis samples in both October and December of 2024. The December diluted sample occurred approximately two weeks before trial. Washington testified, "I think for anyone that's submitting diluted UAs who was in the process of trying to get help, I don't think that would be something that would support or help them in that process of getting—you know, getting to a point where they can do without that drug or substance."

---

[4] Mother tested positive for alcohol twice during this case. She testified, however, that the Department had not ordered her to refrain from consuming alcohol.

Morales testified that she "would have liked to have known" about the diluted samples, that Mother had not shared that information with her, and that she would be surprised to hear Mother had submitted diluted samples. She also testified, however, that she would not consider the diluted test a setback in Mother's recovery and that "when someone has a diluted you have to retest" to discover whether the result "was a true positive or a true negative." Mother testified that she retested and received a true negative result after one diluted sample, but she denied having submitted a second diluted sample. The trial court was not required to credit Mother's testimony over Vigil's on this point. *See, e.g.*, *In re S.R.*, 452 S.W.3d at 365.

Evidence of a parent's "want of self control[] and propensity for violence" is also relevant to a subsection (E) inquiry. *See, e.g.*, *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Both Vigil and Mother testified that while Mother was in jail, she missed two visits with A.D.M. because she was on restriction for fighting with another inmate. Mother testified the altercation occurred when "a pregnant girl tried to fight me while I was using the bathroom. And I didn't fight her. They, I guess, accused me when it was somebody else that actually jumped in. So they put me on restriction for that." Mother testified that she believed she was put on restriction "[b]ecause [she] was arguing in the unit." Again, the trial court was not required to credit Mother's explanation. *In re S.R.*, 452 S.W.3d at 365.

Any portion of the evidence described above may not be sufficient to support a subsection (E) finding if considered in isolation. However, when viewed as a whole and in the light most favorable to the judgment, the evidence was sufficient to allow the trial court to form a firm belief or conviction that Mother engaged in a course of conduct that created a potential for danger which she was aware of but disregarded. *See In re R.S.-T.*, 522 S.W.3d at 110; TEX. FAM. CODE § 161.001(b)(1)(E). Furthermore, the evidence contrary to the trial court's finding is not so

overwhelming that it would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. The evidence is therefore both legally and factually sufficient to support the trial court's predicate finding under subsection (E). *See In re R.S.-T.*, 522 S.W.3d at 110.

We overrule Mother's first and second issues. Because we have concluded the evidence is sufficient to support the trial court's findings under subsections (D) and (E), we need not address Mother's challenge to the trial court's finding under subsection (O). TEX. R. APP. P. 47.1.

### *Best Interest*

### *Applicable Law*

Mother also challenges the legal and factual sufficiency of the trial court's finding that termination of her parental rights was in A.D.M.'s best interest. There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d at 97. To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[5] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme

---

[5] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

Court has used a similar list of factors[6] to determine a child's best interest. TEX. FAM. CODE § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest[.]" *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Furthermore, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, we presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a).

Much of the evidence detailed above in our discussion of subsections (D) and (E) is also relevant to the trial court's best interest finding. Specifically, Mother's history of drug use, the circumstances surrounding R.M.'s death, the pending charges against Mother's live-in paramour, and Mother's failure to complete the battering intervention course all went directly to both statutory and *Holley* best-interest factors. *See id.* § 263.307(b)(7), (8), (10); *Holley*, 544 S.W.2d at 371–72.

---

[6] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The evidence also showed that during the seventeen months this case was pending, Mother moved from jail, to Crosspoint, to a residence with Ariana and Ariana's aunt and cousin, and, approximately two weeks before trial, to a new residence with Ariana and a roommate Mother identified as a "family friend." While Mother gave Vigil the necessary information to conduct a background check on Ariana, she refused to provide information required to conduct background checks on Ariana's aunt and cousin. Mother testified she did not supply that information to the Department because those individuals "don't deal with [the Department] and they didn't want to." Mother also testified that she did not tell Vigil that she had moved to the most recent residence. Based on that testimony, the trial court could have reasonably inferred that Mother did not supply the information necessary to perform a background check on the family friend with whom she lived at the time of trial. The trial court could have concluded that this evidence was relevant to the stability of Mother's home, her willingness to cooperate with the Department, and her parental abilities, including her ability to provide A.D.M. with a safe home environment. *See Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE § 263.307(b)(10), (12)(D).

Grandmother testified that she had had custody of A.D.M. since he was three days old and that he was "thriving." She told the trial court that A.D.M. sees specialists for occupational skills, life skills development, and speech therapy and that he was attending a "really good day care that really focuses on meeting his developmental needs, allowing the specialists to come in and assist with his various therapies. . . . [T]hey're working with him and his food and his language, his social skills with the other peers." Grandmother testified that A.D.M. could "absolutely" stay with her forever if the trial court determined that was in his best interest. *See* TEX. FAM. CODE § 263.307(a). When asked if she believed A.D.M. could be safely returned to Mother, Grandmother testified, "[M]y main concern with his safety has to do with, you know, mom demonstrating—she

hasn't applied what she's been taught." She believed it was in A.D.M.'s best interest for Mother's parental rights to be terminated, concluding: "I think it's important that [A.D.M.] has stability, which I've maintained. I think it's important that he has safety, which I've maintained." The CASA volunteer testified that she visited A.D.M. at least once a month and believed he should remain with Grandmother.

Mother testified that her visits with A.D.M. went well and that the child called her "momma" and liked to hold her hand while they read together. Morales, who had been counseling Mother for approximately a year at the time of trial, testified that she believed Mother could be appropriately protective of A.D.M. and that she would choose him over anyone else in her life. She also testified that she had no concerns about Mother's safety with Ariana and that Mother and Ariana lived in a "very nice, well-maintained home" in a "[v]ery good neighborhood."[7] But Morales also testified that she had never met Ariana or anyone else living in the home and that she had never seen Mother interact with A.D.M. And, as noted above, the trial court heard evidence that tended to show Mother chose her roommates' desire to avoid interacting with the Department over complying with the Department's request to perform background checks on those roommates.

When viewed in the light most favorable to the judgment, the evidence presented below was sufficient to allow the trial court to form a firm belief or conviction that termination of Mother's parental rights was in A.D.M.'s best interest. *See* TEX. FAM. CODE § 263.307; *Holley*, 544 S.W.2d at 371–72. Furthermore, the evidence contrary to the trial court's finding was not so overwhelming as to prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. The evidence is therefore legally and factually sufficient to support the trial court's best-interest finding.

---

[7] The record does not clearly indicate whether Morales's testimony on this point referred to Mother's previous home or the one she moved into shortly before trial.

**CONCLUSION**

We affirm the trial court's order of termination.

Lori I. Valenzuela, Justice